# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DENISE PRICE, individually and as the personal representative and administrator of the Estate of Jeffrey Price, Jr., <u>et al.</u>, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )  Civil Action No. 20-614 (RBW)<br>) |
| MICHAEL PEARSON, <u>et al.</u>, | )<br>) |
| Defendants. | )<br>)<br>) |

## <u>MEMORANDUM OPINION</u>

The plaintiffs, Jeffrey Price, Sr. and Denise Price, individually and as the personal representative of the Estate of Jeffrey Price, Jr. ("the plaintiffs' decedent"), bring this civil action against the defendants, the District of Columbia ("the District"), Metropolitan Police Department ("the MPD") officers Michael Pearson ("Officer Pearson"), David Jarboe ("Officer Jarboe"), Anthony Gaton ("Officer Gaton"), and an unidentified MPD officer, asserting constitutional claims of unreasonable seizure by excessive force in violation of the Fourth Amendment, <u>see</u> Complaint ("Compl.") ¶¶ 47–59 (Count I), 138–47 (Count X), ECF No. 1; Fifth Amendment due process violations, <u>id.</u> ¶¶ 60–69 (Count II), 148–57 (Count XI); and <u>Monell</u> liability based on those alleged constitutional violations pursuant to 42 U.S.C. § 1983, <u>id.</u> ¶¶ 70–86 (Count III); and the Survival Act, D.C. Code § 12-101, <u>id.</u> ¶¶ 158–78 (Count XII).  The plaintiffs also bring common-law claims of negligence, negligence <u>per se</u>, and gross negligence, <u>see</u> <u>id.</u> ¶¶ 87–96 (Count IV), 179–97 (Count XIII); assault, <u>see</u> <u>id.</u> ¶¶ 97–107 (Count V), 198–205 (Count XIV); battery, <u>see</u> <u>id.</u> ¶¶ 108–15 (Count VI), 206–13 (Count XV); negligent infliction of emotional distress, <u>see</u> <u>id.</u> ¶¶ 116–20 (Count VII), 214–22 (Count XVI); intentional infliction of emotional

distress, see id. ¶¶ 121–26 (Count VIII), 223–29 (Count XVII); and negligence based on the

District's hiring, retention, training and supervision of the defendant police officers, see id. ¶¶

127–37 (Count IX), 230–35 (Count XVIII), pursuant to the Survival Act (specifically, Counts

XIII, XIV, XV, XVI, XVII, and XVIII) and the Wrongful Death Act, D.C. Code § 16-2701

(specifically, Counts IV, V, VI, VII, VIII, and IX).[1]  Currently pending before the Court is the

Defendants' Motion for Summary Judgment ("Defs.' Mot."), ECF No. 44.  Upon careful

consideration of the parties' submissions,[2] the Court concludes for the following reasons that it

must grant the defendants' motion for summary judgment as to the § 1983 claims and decline to

---

[1] "Under District of Columbia law, negligent conduct resulting in death gives rise to two independent rights of action, one under the Wrongful Death Act and one under the Survival Act[.]"  Semler v. Psychiatric Inst. of Wash., D.C., Inc., 575 F.2d 922, 924 (D.C. Cir. 1978).  "The Wrongful Death Act is said to create an entirely new right of action in favor of designated beneficiaries[,]" in order to "provide a remedy [to] close relatives of the deceased, who might naturally have expected maintenance or assistance from the deceased had he lived[.]"  Id. at 924–25.  "The Survival Act, on the other hand, does not create a new right of action for designated beneficiaries, but rather preserves and carries forward for the benefit of the deceased's estate the right of action which the deceased would have had, had he not died."  Id. at 925.

> A [ ] recovery [for plaintiffs] under the [Wrongful Death] Act comprises three amounts: (1) [their] expected annual share 'in the deceased's earnings multiplied by the decedent's work life expectancy and discounted to present worth,' (2) 'the value of service the decedent would have provided' [the] plaintiff[s] such as 'care, education, training, guidance and personal advice,' and (3) the costs of 'reasonable' burial expenses.

Robinson v. District of Columbia, 130 F. Supp. 3d 180, 188 (D.D.C. 2015) (internal citations omitted) (citing § 16-2701(b)).  "The Act makes no provision, however, for a relative to seek damages for grief or emotional distress."  Id. (citing Runyon v. District of Columbia, 463 F.2d 1319, 1322 (D.C. Cir. 1972) (noting that "parties recovering under the Act 'may not be compensated for their grief'")).  In comparison, under the Survival Act, the estate of a deceased person is entitled to recover "'probable net future earnings,' less what he 'would have used to maintain himself and those entitled to recover under the Wrongful Death Act,'. . . [and] damages for his pain and suffering—i.e., the 'bodily injury, mental anguish, and discomfort he experienced' from the moment of injury 'until his death.'"  Id. (quoting Burton v. United States, 668 F. Supp. 2d 86, 110 (D.D.C. 2009)).  Based on the Court's resolution of the plaintiffs' federal claims, these claims will be dismissed without prejudice.

[2] In addition to the filings already identified, the Court also considered the following submissions in rendering its decision: (1) the Defendants' Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment ("Defs.' Facts"), ECF No. 44-1; (2) the [Plaintiffs'] Opposition to the . . . [Defendants'] Motion for Summary Judgement ("Pls.' Opp'n"), ECF No. 49; (3) the [Plaintiffs] . . . Dispute[ of the] Material Facts 28-32, 40, 41, 43 with Respect to the Defendants' Assertion of Defendants' "Undisputed" Material Facts ("Pls.' Doc."), ECF No. 50; (4) the Plaintiffs' Statement of Undisputed Material Facts in Support of their Opposition to Defendants' Motion for Summary Judgment ("Pls.' Facts"), ECF No. 50-14; (5) the Defendants' Reply in Support of their Motion for Summary Judgment ("Defs.' Reply"), ECF No. 51; and (6) the Plaintiff Price's Supplemtnal Opposition to the District of Columbia's and Defendants Motion for Summary Judgment, ECF No. 56.

exercise supplemental jurisdiction over the pendent state law claims and dismisses those claims without prejudice.

## I.    BACKGROUND

On May 4, 2018, the District of Columbia's Office of Unified Communications "received a 911 call reporting the sounds of gunfire outside [of] a public charter school located at 5300 Blaine Street N.E."  Defs.' Facts ¶ 1; see Pls.' Facts ¶ 1.  The defendants state, and the plaintiffs do not dispute, that "[w]itnesses described seeing a four-wheeler and a red-and-white dirt bike, or motorcycle, in the area at the time, both driven by black males, and that one of the drivers was wearing a ski mask."  Defs.' Facts ¶ 2.  The plaintiffs state that "[t]here was no witness who directly attributed this shooting incident to [the plaintiffs' decedent,] Jeff[re]y Price[, Jr.,]" but do not offer evidence disputing the defendants' claim that witnesses described seeing a dirt bike in the area.  Pls.' Facts ¶ 2.  "[The plaintiffs' decedent,] Jeff[re]y Price[, Jr.,] lived in the same general area[,]" which was also near a "major neighborhood park."  Id. ¶ 6.  MPD Officers Jarboe and Gaton canvassed the area in their police vehicle in response to the broadcasted reports of gunfire, see Defs.' Facts ¶ 3; Pls.' Facts ¶ 9, during which time "Officer Jarboe was driving and Officer Gaton was the passenger[,]" Defs.' Facts ¶ 4; see Pls.' Facts ¶ 10.

"A few minutes after the 911 call, MPD Sergeant Paul Skelton was driving on 53[rd] Street, N.E., when he observed a red-and-white dirt bike driving [on] the same street in the opposit[e] direction."  Defs.' Facts ¶ 5.  "Seconds" later, Sergeant Skelton "reported over his police radio that he saw a black male wearing gray pants, on a dirt bike with a mask on[.]"  Id. ¶ 6.  "Seconds after that, Officers Jarboe and Gaton observed a black male wearing a black mask and driving a red-and-white dirt bike on Blaine Street, heading towards Division Avenue."  Id. ¶ 8.  "Officer Jarboe's body[-]worn camera shows he reported the dirt bike coming up Division

Avenue at 17:26:04 to 17:26:10[ military time].”  Id. ¶ 10.  Officer Jarboe had not received

“permission from his [w]atch [c]ommander or a [s]uperior [o]fficer to pursue the vehicle driven

by [the plaintiffs’ decedent,] Jeff[re]y Price, Jr.[,]” Pls.’ Facts ¶ 26, but “Officers Jarboe and

Gaton followed the dirt bike down Blaine Street, [and] then [they] followed it onto Division

Avenue by turning right[,]” Defs.’ Facts ¶ 11.  “Officer Jarboe reported over his police radio

seeing [the] red dirt bike, ‘coming up on’ Division Avenue[,]” id. ¶ 9, and reported following the

dirt bike, see id. ¶ 11.  “Officer Jarboe’s body[-]worn camera shows he reported the dirt bike

going down Division Avenue toward Burroughs at 17:26:13 to 17:26:16[ military time,]” id. ¶

13, and he turned on his vehicle’s sirens at 17:26:29[ military time],” see id. ¶ 14.

    During the same time period, “Officer Michael Pearson was parked on Fitch Place[,] N.E.

when he heard the reports of gunfire and the reports of the dirt bike in the area.”  Id. ¶ 21.

Officer Pearson “began to pull out of his parking spot at about 17:26:11[ military time].”  Id.

¶ 23.  “Officer Pearson drove on Fitch Place toward Division Avenue for approximately

[fourteen] seconds before reaching a stop sign on Fitch Place at the intersection with Division

Avenue.”  Id. ¶ 24.  “[Officer] Pearson didn’t stop his vehicle in front of the stop sign at Fitch

Place[,]”  Pls.’ Facts ¶ 31; rather, he “slowed his vehicle as he approached the stop sign, but he

did not come to a complete stop at the stop sign[,]” see Defs.’ Facts ¶ 29.  “As Officer Pearson

began to turn right, which [ ] put him driving south in the southbound lane, he saw the dirt bike

for the first time, driving north in the southbound lane, coming towards him.”  Id. ¶ 31 (emphasis

omitted).  Although the plaintiffs assert that “[a witness] recalls seeing [the plaintiffs’ decedent]

exclusively in the [n]orthbound lane going [n]orth[,]” Pls.’ Facts ¶ 87, “[the p]laintiff[]s[’] own

crash reconstruction expert[ stated under oath that] the dirt bike was in the southbound lane on

Division [Avenue] when its driver, [the plaintiffs' decedent] 'perceived a hazard and took evasive action' to avoid it[,]" Defs.' Facts ¶ 38 (emphasis omitted).

At the time the dirt bike appeared to take evasive action, it was likely speeding because "[t]he speed limit on Division Avenue is [twenty-five] miles per hour." Id. ¶ 42. This is evinced by the fact that "[t]he dirt bike's skid left a skid mark approximately [one hundred fourteen] feet long on Division Avenue, originating in the southbound lane and ending in the northbound lane." Id. ¶ 41. "Had [the plaintiffs' decedent] been [traveling] at the posted speed limit of [twenty-five] miles per hour, and applied the brakes, he would have stopped within [ninety-two] feet and therefore avoided the collision." Id. ¶ 44. "According to [the d]efendants' expert, Officer Pearson first saw the dirt bike less than [two] seconds before the collision." Id. ¶ 36. Tragically, Officer Pearson was still in the intersection "when the [decelerating] dirt bike [driven by the plaintiffs' decedent] collided with [the MPD vehicle's] passenger side door." Id. ¶ 33. Officers Jarboe and Gaton "reacted aloud to seeing the collision at 17:26:31[ as depicted on Officer Jarboe's body camera footage]." Id. ¶ 16. "[The plaintiffs' decedent,] Mr. Price[, Jr.,] died as a result of injuries sustained in the collision." Defs.' Facts ¶ 48.

## A.  Procedural Background

The plaintiffs filed their Complaint on March 3, 2020. See Comp. at 1. On April 21, 2023, after discovery in this case concluded[3], the defendants filed their motion for summary judgment, see generally Defs.' Mot., along with their statement of undisputed facts, see Defs.' Facts at 1. The plaintiffs filed their opposition to the defendants' motion on July 3, 2023, and an

---

[3] The Court notes that discovery was not conducted as to whether the District of Columbia had any policy or custom (under Monell) that resulted in the violation of the constitutional rights of the plaintiffs' decedent. See Order at 1 (Oct. 16, 2020), ECF No. 24. Because the Court ultimately grants summary judgment to the defendants on the constitutional claims, and the plaintiffs do not argue that they need Monell discovery before the defendants' motion is resolved, the Court concludes that it is appropriate to rule on the motion.

opposition to the defendants' undisputed facts on July 10, 2023.  <u>See</u> Pls.' Opp'n; <u>see also</u> Pls.'

Doc.  The defendants' filed a reply to the opposition on August 9, 2023.  <u>See</u> Defs.' Reply.

Finally, a motion hearing on the defendants' motion was held on December 19, 2024.  <u>See</u>

Minute ("Min.") Entry (Dec. 19, 2024).

## II.    STANDARDS OF REVIEW

A court may grant a motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56 only if "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it 'might

affect the outcome of the suit under the governing law,' and a dispute about a material fact is

genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  <u>Steele v. Schafer</u>, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting <u>Anderson v. Liberty

Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  When ruling on a motion for summary judgment, "[t]he

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

[or her] favor."  <u>Anderson</u>, 477 U.S. at 255.  "Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of

a judge . . . ruling on a motion for summary judgment[.]"  <u>Id.</u>  The movant has the burden of

demonstrating the absence of a genuine issue of material fact and that the non-moving party

"fail[ed] to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v.

Catrett</u>, 477 U.S. 317, 322 (1986).

When a non-moving party supports their position via affidavit or declaration, "[it] must

set forth . . . specific facts[,]" <u>Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.</u>, 564

F.3d 462, 465 (D.C. Cir. 2009) (internal quotation marks omitted), pursuant to Rule 56(e), "that

is, it 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated,'" id. (quoting Fed. R. Civ. P. 56(e)(1)). "Although, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule." Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999); see also Dist. Intown Props. Ltd. P'ship v. District of Columbia, 198 F.3d 874, 878 (D.C. Cir. 1999) ("[T]he court must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record.").

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, the non-moving party "must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson, 477 U.S. at 248 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position . . . [is] insufficient" to withstand a motion for summary judgment; rather, "there must be [some] evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

### III.    ANALYSIS

The defendants argue that they are entitled to summary judgment on the plaintiffs' Fourth and Fifth Amendment claims (Counts I, II, III, X, XI, and XII) because "no reasonable juror could find," Defs.' Mot. at 10, that the "[d]efendants intentionally caused the collision with [the plaintiffs' decedent,] Mr. Price[, Jr.]," id. (emphasis omitted). The defendants argue for summary judgment on the plaintiffs' assault and battery claims (Counts V, VI, XIV, and XV) based on similar reasoning. See id. at 16 ("Both torts require proof of an intent to harm . . . and

no reasonable juror could find on this record that these officers intended to harm, threaten, or [come in] contact [with the plaintiffs' decedent,] Mr. Price[, Jr].").  The "[d]efendants do not dispute [that] Officer Pearson failed to come to a complete stop at the stop sign at the intersection of Fitch Place and Division Avenue, or that Officer Jarboe was exceeding the speed limit as he followed the dirt bike north on Division Avenue," id. at 18, and that "these actions may have breached a duty to comply with traffic laws," id.  But, the defendants argue that they are nonetheless entitled to summary judgment on the negligence claims (Counts IV and XIII) because the plaintiffs cannot "prove this conduct proximately caused the collision."  Id. Moreover, the defendants argue that they are entitled to summary judgment on the intentional and negligent infliction of emotional distress claims (Counts VII, VIII, XVI, and XVII) because "no reasonable juror could find [the] Officers Pearson, Jarboe, or Gaton intentionally or even recklessly engaged in outrageous conduct . . . [or] that the officers' conduct caused compensable emotional distress."  Id. at 26.  Lastly, the defendants argue that they are entitled to summary judgment on the negligent hiring, retention, training, and supervision claims (Counts IX and XVIII) because "the record contains no evidence . . . that the District knew or should have known before the collision that any of the officers at issue should not have been hired or required additional training or supervision."  Id. at 27.

In opposition to the defendants' motion, the plaintiffs argue that they have provided evidence in support of their negligence in hiring, retention, training, and supervision claim— namely, that Officer Jarboe did not face punishment for his conduct and that Officer Pearson only received one day of suspended pay.  See Pls.' Opp'n at 3 ("Jarboe is not punished for driving double the speed limit forcing [Mr.] Price[, Jr.] to drive ever faster into the vehicular barricade set up by Pearson on Division Avenue . . . [and] [t]hen Pearson gets one day suspended

in pay . . . This[, the plaintiffs contend,] demonstrates . . . that the District is engaged in their own cover-ups from the top to bottom as all seek to escape accountability[.]").  And, for the claims requiring a showing of intent by the officers, the plaintiffs argue that "the [d]efendants intentionally set into motion actions that carried with them a serious risk of death or bodily harm and that the officers knew of the risk of extreme bodily harm and death." Id. at 9.

**A.      Section 1983**

"Every person who, under color of any statute, ordinance, regulation custom, or usage, of any State or Territory or the District of Columbia, subjects . . . [any] person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law[.]" 42 U.S.C. § 1983.  "A municipality or local government, such as the District[ of Columbia], is a 'person' for section 1983 purposes." Frederick Douglass Found., Inc. v. District of Columbia, 82 F.4th 1122, 1136 (D.C. Cir. 2023) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 692 (1978)).  "To state a claim under section 1983, a plaintiff must allege both (1) that he [or she] was deprived of a right secured by the Constitution or laws of the United States, and (2) that the defendant acted 'under the color of' the law of a state, territory or the District of Columbia." Hoai v. Vo, 935 F.2d 308, 312 (D.C. Cir. 1991).  "[I]t is only violations of rights, not laws, which give rise to §1983 actions." Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002). Accordingly, only "an unambiguously conferred right [may] support a cause of action brought under § 1983." Id.

**1.  The Plaintiffs' Fourth Amendment Claims (Count I and X)**

The Court first addresses the plaintiffs' Fourth Amendment claims, which are based on the alleged use of excessive force.  The defendants argue that they are entitled to summary judgment on these claims because "[the] [p]laintiffs cannot prevail . . . without proving one or

more [of the] individual [d]efendants <u>intentionally</u> caused the collision with [the plaintiffs'
decedent,] Mr. Price[, Jr., and n]o reasonable juror could find [that the] [p]laintiffs have met that
requirement." Defs.' Mot. at 10. In response, the plaintiffs argue that "the [d]efendants
intentionally set into motion actions that carried with them a serious risk of death or bodily harm
and that the officers knew of the risk of extreme bodily harm and death." Pls.' Opp'n at 9.

The Fourth Amendment protects the "right of the people to be secure in their persons,
houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend.
IV. Where, as here, "[t]h[e] case concerns the [alleged] 'seizure' of a 'person,' . . . [the question
becomes whether] 'physical force' or a 'show of authority' [ ] 'in some way restrain[ed] the
liberty' of the person." <u>Torres v. Madrid</u>, 592 U.S. 306, 311 (2021) (quoting <u>Terry v. Ohio</u>, 392
U.S. 1, 19 (1968)). "To make out a claim of unreasonable seizure, [the plaintiffs] must show that
(1) the challenged actions constitute a seizure, and (2) the seizure was unreasonable." <u>Robinson</u>
<u>v. District of Columbia</u>, 130 F. Supp. 3d 180, 191 (D.D.C. 2015).

A seizure "requires <u>either</u> physical force . . . <u>or</u>, where that is absent, <u>submission</u> to the
assertion[—or 'show'—]of authority." <u>California v. Hodari D.</u>, 499 U.S. 621, 626 (1991). In
regards to a seizure involving physical force, "[e]ven 'a mere touch' can satisfy this rule, and the
force need not ultimately 'succeed' in subduing the person to amount to a seizure." <u>Jones v.</u>
<u>District of Columbia</u>, No. 21-cv-836 (RC), 2021 WL 5206207, at *4 (D.D.C. Nov. 9, 2021)
(quoting <u>Torres</u>, 592 U.S. at 317). However, "for an officer's application of physical force to
qualify as a seizure, the officer must 'use [the] force <u>with intent to restrain</u>'; that is, with the
intent to 'apprehend.'" <u>Id.</u> (quoting <u>Torres</u>, 592 U.S. at 317). "Courts determine whether an
officer intended to restrain by examining 'whether the challenged conduct <u>objectively</u> manifests
an intent to restrain,' rather than by inquiring into the officer's subjective motives." <u>Id.</u> (quoting

Torres, 592 U.S. at 317). And, "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." Torres, 592 U.S. at 325. Importantly, "[a]ccidental force will not qualify. Nor will force intentionally applied for some other purpose satisfy this rule." Id. at 317 (internal citation omitted).

A show of authority seizure occurs where "in [the] view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Jordan, 951 F.2d 1278, 1281 (D.C. Cir. 1991) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). Importantly, "a person [must also] submit[] to an officer's show of authority" to constitute a Fourth Amendment violation. United States v. Gamble, 77 F.4th 1041, 1044 (D.C. Cir. 2023) (quoting United States v. Delaney, 955 F.3d 1077, 1081 (D.C. Cir. 2020)). In assessing whether police action was a show of authority, courts must consider "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554.

For a Fourth Amendment violation to occur, a seizure must also be unreasonable. "A seizure may be unreasonable both because it was unjustified under the circumstances—i.e., the police lacked probable cause to arrest or reasonable suspicion to seize the suspect—or because the force used to effectuate it was excessive." Robinson, 130 F. Supp. 3d at 192; see Graham v. Connor, 490 U.S. 386, 395 (1989) ("[T]he 'reasonableness' of a particular seizure depends not only on when it is made, but also on how it is carried out.") (quoting Tennessee v. Garner, 471 U.S. 1, 7–8 (1985)). Where, as here, a plaintiff alleges that the force used to effectuate a seizure was excessive, "[he or] she must prove that the force used to carry out that seizure was

objectively unreasonable." <u>Robinson</u>, 130 F. Supp. 3d at 193.  When engaging in this inquiry, courts must examine "the perspective of a reasonable officer on the scene."  <u>Graham</u>, 490 U.S. at 396.  And, in conducting this analysis, courts consider factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  <u>Id.</u>

The Court will first address whether the plaintiffs' decedent's Fourth Amendment rights were violated by Officers Jarboe and Gaton before then assessing whether they were violated by Officer Pearson.

### a.   Whether the Plaintiffs' Decedent's Fourth Amendment Rights Were Violated by Officers Jarboe and Gaton

First, as to Officers Jarboe and Gaton, they arguably made a show of authority when they followed the plaintiffs' decedent down Blaine Street and onto Division Avenue and when Officer Jarboe turned on the police vehicle's siren approximately two seconds before the collision occurred.  <u>See</u> Defs.' Facts ¶¶ 11–15; Pls.' Facts ¶ 15.  However, the defendants argue that "[e]ven if Officers Jarboe and Gaton were chasing [the plaintiffs' decedent,] Mr. Price[, Jr.], they did not [a]ffect his stop, and thus they did not engage in a seizure[.]"  Defs.' Mot. at 14.  The plaintiffs do not argue that Officers Jarboe and Gaton directly made contact with the plaintiffs' decedent, nor do they argue that he complied with any demand from Officers Jarboe or Gaton. <u>See</u> Pls.' Opp'n at 4 ("At this point, the [p]laintiffs concede that the DC MPD SUV marked police vehicle driven by [Officer] Jarboe, did not touch [the plaintiffs' decedent,] Price[, Jr.]"). The plaintiffs do, however, argue that indirect contact by Officers Jarboe and Gaton is enough to constitute a seizure.  <u>See</u> Pls.' Opp'n at 7 ("[Indirect contact is acceptable contact]").  In their brief, the plaintiffs repeatedly cite <u>United States v. Sutton</u>, 706 F. Supp. 3d 1 (D.D.C. 2023), for

the proposition that "no direct contact with a police vehicle is required to establish legal liability[,]" Pls.' Opp'n at 4.

However, <u>Sutton</u> is a criminal case where two officers were convicted of conspiracy and obstruction of justice, and one officer was additionally convicted of second-degree murder—<u>viz.</u>, the case did not concern an alleged civil Fourth Amendment violation.  See <u>Sutton</u>, 706 F. Supp. 3d at 10.  Indeed, the officers in <u>Sutton</u> were convicted in large part due to evidence of what was known before the pursuit, the conduct engaged in during the pursuit, and subsequent actions taken after the fatal collision in that case.  See <u>id.</u> at 18 ("It was clear from the evidence at trial that [the decedent in that case] was known to the [convicted MPD] officers, including Mr. Sutton—and that Mr. Sutton was known to [the decedent]—prior to the chase and fatal collision."); <u>id.</u> at 26 ("Mr. Sutton continued to pursue [the decedent] through the residential neighborhood for several minutes, making multiple turns and reaching speeds up to forty-five miles per hour[.]"); <u>id.</u> at 37 ("[The] evidence suggested that at no time prior to the collision did any of the four officers in the [MPD] vehicle use the main channel to broadcast information about their interaction with or pursuit of [the decedent.]"); <u>id.</u> at 45–46 (explaining that Sutton's crash report included factual inaccuracies about the pursuit).

To be clear, under § 1983, in certain circumstances, indirect contact can constitute a seizure, <u>see</u> <u>Brower v. County of Inyo</u>, 489 U.S. 593, 599 (1989) ("The complaint here sufficiently alleges that [the officers], under color of law, sought to stop Brower by means of a roadblock and succeeded in doing so.  That is enough to constitute a 'seizure' within the meaning of the Fourth Amendment[.]"); however, the contact must be intentional, <u>see</u> <u>id.</u> at 596–97 ("[A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement [ ], nor even whenever there is a

governmentally caused and governmentally <u>desired</u> termination of an individual's freedom of

movement [ ], but only when there is a governmental termination of freedom of movement

<u>through means intentionally applied</u>.").  Here, unlike <u>Sutton</u>, there is nothing in the record to

indicate that Officers Jarboe and Gaton knew the plaintiffs' decedent; nor did the officers know

where Officer Pearson was going to be for the purpose of intentionally <u>causing</u> the collision.  <u>See</u>

Defs.' Mot. at 17 ("[T]here is no evidence [Officers Jarboe and Gaton] even knew Officer

Pearson was in the area until the collision occurred."); Defs.' Facts ¶ 37 ("Officer Pearson did

not communicate with Officers Skelton, Jarboe, or Gaton before the collision (other than his

hearing them speak over the radio).").  Thus, the Court rejects any suggestion by the plaintiffs

that <u>Sutton</u> supports the position that officers Jarboe or Gaton intentionally seized the plaintiffs'

decedent in this case.

   The plaintiffs also argue that intent, as the basis for a Fourth Amendment violation, can

be established by reckless conduct.  <u>See</u> Pls.' Opp'n at 10 (contending that intent can be

established either "by doing such reckless and wanton acts[, such as] chasing in violation of the

principles established in [MPD General Order 301.03] . . . [or by] breach[ing] the civil standard

for intentional torts such as battery and assault [ ] and intentional and negligent infliction of

emotional distress[.]").  However, there is scant evidence before the Court that supports the

theory that Officers Jarboe and Gaton were even pursuing the plaintiffs' decedent beyond just

following him.  And although Officer Jarboe activated his vehicle's siren moments before the

collision, <u>see</u> Defs.' Facts ¶ 14, and assuming <u>arguendo</u> that the officers at that point were

pursuing the plaintiffs' decedent, the plaintiffs fail to show how pursuing the plaintiffs' decedent

amounted to reckless conduct by Officers Jarboe and Gaton, <u>cf.</u> <u>Cnty. of Sacramento v. Lewis</u>,

523 U.S. 833, 854 (1998) ("[H]igh-speed chases with no intent to harm suspects physically . . .

[are not] redressable by an action under § 1983.").  To reiterate, to establish a Fourth

Amendment violation, there must be a seizure accomplished by a <u>submission</u> to a show of

authority or the intentional application of physical force.  <u>See</u> <u>Brower</u>, 489 U.S. at 596–97 (A

"Fourth Amendment seizure [ ] occur[s] . . . when there is a governmental termination of

freedom <u>through means intentionally applied</u>."); <u>Gamble</u>, 77 F.4th at 1047 (Srinivasan, J.,

concurring) ("If the person submits to [ ] a show of authority by an officer, a seizure will have

taken place, even though there has been no physical contact in the interaction.").  Here, the

evidence before the Court does not support such a conclusion.  Accordingly, the Court must

grant the defendants' motion for summary judgment as to Counts I and X as related to Officers

Jarboe and Gaton.

> **b.**    **Whether the Plaintiffs' Decedent's Fourth Amendment Rights Were Violated by Officer Pearson**

The Court next considers whether the plaintiffs' decedent was unreasonably seized and

was subjected to excessive force by the actions of Officer Pearson.  The defendants argue that:

> For a juror to find Officer Pearson <u>intended</u> to collide with [the plaintiffs'
> decedent,] Mr. Price[, Jr.], the juror would have to believe, with no evidence, that
> Officer Pearson timed his entry into the intersection perfectly with Mr.
> Price[, Jr.]'s arrival, and then, upon seeing Mr. Price[, Jr.] for the first time
> advancing upon him in the wrong lane, correctly guessed, within about a second,
> that Mr. Price[, Jr.] would react to seeing the SUV by moving into the northbound
> lane, and, based on that guess, altered his own course with the intent to collide
> with Mr. Price[, Jr.] in a lane other than the one Mr. Price[, Jr.] occupied.

Defs.' Mot. at 13.

The plaintiffs respond that Officer Pearson's "failure to stop at the stop sign[,]" failure to

"sound[] the factory installed siren," "fail[ure] to lower his passenger window to allow ambient

noise," "using his left hand to wind up counter clock-wise to get leverage to swing the steering

wheel clockwise[,]" "brac[ing] for the collision," and failure to fully accelerate to clear the

plaintiffs' decedent's path are all indications that Officer Pearson intended to intentionally cause the collision. Pls.' Opp'n at 16–18. The plaintiffs also provide the statements of three witnesses, see id., Exhibit ("Ex.") (Statement Under Oath by Witness Patrice Squire ("Squire Statement")) at 1, ECF No. 49-14; id., Ex. (Statement Under Oath by [ ] Witness Darion K. Muhammad ("Muhammad Statement")) at 1, ECF No. 49-17; id., Ex. (Statement Under Oath by [ ] Witness Wilbert Smith ("Smith Statement")) at 1, ECF No. 49-18, who each opine that the collision seemed intentional on the part of the officers, see id. at 21–22.

In their reply, the defendants argue that the plaintiffs do not provide "evidence that Officer Pearson had sufficient information, in advance of reaching the stop sign, to perfectly time his movement into the intersection and against [the plaintiffs' decedent,] Mr. Price[, Jr.]" Defs.' Reply at 7. "According to [the d]efendants' expert, Officer Pearson first saw the dirt bike less than two seconds before the collision." Defs.' Mot. at 7. The defendants point out that the plaintiffs' expert did not conduct any analysis to show that Officer Pearson could have avoided the collision by driving out of the intersection into the park adjacent to the street where the collision occurred. See Defs.' Reply at 8 ("[The p]laintiffs cite no evidence in support of their theory that Officer Pearson could have avoided the collision by driving off Division Avenue . . . , [the p]laintiffs' expert David Rineholt did suggest this was possible in his report, but admitted in [his] deposition that he had done no analysis to show that this would in fact have worked to avoid the collision[.]") (internal citation omitted).

Furthermore, the "[d]efendants' expert in crash reconstruction, Michael Miller, reconstructed Officer Pearson's line of sight" and stated in his report that "southbound and northbound traffic south of Fitch Place, N.E. cannot be seen and is fully obstructed." Defs.' Mot. at 4 (internal quotations omitted). On the other hand, the defendants point out that the

"[p]laintiffs' crash reconstruction expert did not opine on either driver's line of sight in his report."  Defs.' Mot. at 5.  Finally, although in their reply brief the "[d]efendants concede Officer Pearson did not activate his sirens or roll down his windows[,] [ ] according to [the d]efendants' expert, Officer Pearson did activate his lights and depress his horn twice before entering the intersection."  Defs.' Reply at 7.  Based on this evidence, the defendants argue that "[n]o reasonable juror could conclude that an officer who activated his lights and honked his horn twice was trying to sneak into the intersection so that he might intentionally collide with [the plaintiffs' decedent] Mr. Price[, Jr]."  Id.

For the following reasons, the Court concludes that a reasonable juror could not find that Officer Pearson <u>intentionally</u> caused the plaintiffs' decedent to collide with the vehicle he was driving.  First, Officer Pearson did not know that the plaintiffs' decedent would be entering the intersection where the collision occurred at almost precisely the same time he did.  Officer Skelton was the first officer to identify the plaintiffs' decedent heading in the opposite direction on 53rd Street, Northeast, which was "between 17:25:48 and 17:26:00 [military time.]"  <u>See</u> Defs.' Facts ¶¶ 5–7.  The record reflects that "[s]econds after that, Officers Jarboe and Gaton observed a black male wearing a black mask and driving a red-and-white dirt bike on Blaine Street, heading toward Division Avenue."  <u>Id.</u> ¶ 8.  Shortly after making that observation, Officers Jarboe and Gaton followed and observed the plaintiffs' decedent as he was "going down Division Ave. toward Burroughs Avenue[,]" <u>id.</u> ¶¶ 11–12 (internal quotation marks omitted), but at that time there is no indication that they reported how fast they were traveling, nor did they report the lane in which the plaintiffs' decedent was traveling, <u>see id.</u> ¶ 12 ("[Officer Jarboe] did not report which lane the dirt bike was driving in.").  Thus, although Officer Pearson headed toward Division Avenue in response to reports of gunfire, <u>see id.</u> ¶ 21, and was likely aware of

17

the reports of the plaintiffs' decedent traveling down Division Avenue, there is no evidence that he was aware of the plaintiffs' decedent's exact location as he approached the intersection where the collision occurred.

When Officer Pearson entered the intersection, he had virtually no time to react upon first seeing the plaintiffs' decedent.  Specifically, the record indicates that the plaintiffs' decedent was driving at least fifty miles per hour as he was traveling down Division Avenue, see id. ¶ 19, and, despite the conflicting eye-witness testimony regarding the lane in which the plaintiffs' decedent was traveling, compare Pls.' Opp'n, Ex. (Squire Statement) at 3 ("[The plaintiffs' decedent] hit the cruiser in the middle of his correct lane of travel at about the middle of the police cruiser[.]"); with id., Ex. (Smith Statement) at 1 ("[The motorbike] went up the hill on Division Avenue on the side of the street closest to Fitch Place, N[.]E."), there is conclusive evidence which shows that he was indeed traveling north in the southbound lane of Division Avenue immediately before the collision actually occurred, see Defs.' Facts ¶ 31 ("As Officer Pearson began to turn right, which would put him driving south in the southbound lane, he saw the dirt bike for the first time, driving north in the southbound lane, coming towards him."); Defs.' Mot., Ex. K (Deposition of Officer Michael Pearson ("Pearson Dep.")) at 82:222; 83:1–6, ECF No. 44-8; id., Ex. M (Defendants' Expert Report of Michael Miller ("Miller Report")) at 25–26, ECF No. 44-9 (explaining images that depict the skid marks left by the plaintiffs' decedent's dirt bike beginning in the southbound lane on Division Avenue and ending in the northbound lane on that same street); see id., Ex. N (Plaintiffs' Expert Report of David Rineholt ("Rineholt Report")) at 20, ECF No. 44-10 ("[The dirt bike] had strayed into the southbound travel lanes of Division [Avenue.]").  As Officer Pearson approached the intersection, he had to actually enter Division Avenue because to observe any vehicles approaching his location, "[d]rivers in line with the stop

sign on Fitch Place cannot see very far onto Division Avenue in the southbound direction[ because] the view is obstructed." Defs.' Facts ¶ 27. And, as the Court indicated above, "Officer Pearson first saw the dirt bike less than [two] seconds before the collision." Id. ¶ 36; see Defs.' Mot., Ex. M (Miller Report) at 38–45 (detailing the line of sight for both Officer Pearson and the plaintiffs' decedent seconds before the crash). As was the case here, "[o]fficers are often required to make split-second judgments on what force to use in tense, uncertain, and rapidly evolving circumstances[,]" Bushrod v. District of Columbia, 521 F. Supp. 3d 1, 21 (D.D.C. 2021) (internal quotation marks omitted), and based on the record in this case, the Court must conclude that the plaintiffs failed to show how Officer Pearson—with little knowledge about the plaintiffs' decedent or his precise location—could have formed the requisite intent to restrain the plaintiffs' decedent by causing the collision, see Jones, 2021 WL 5206207, at *4 (quoting Torres, 592 U.S. at 317) ("[T]he officer must 'use [ ] force with intent to restrain'; that is, with the intent to 'apprehend.'").

The Court is also unpersuaded that a reasonable juror could conclude that Officer Pearson's body camera footage alone demonstrates an intent to restrain the plaintiffs' decedent by causing the collision. Essentially, the plaintiffs argue that the footage from the camera shows Officer Pearson turning his steering wheel in such a manner that suggests he intentionally blocked the lane on Division Avenue where he saw the plaintiffs' decedent traveling and intentionally caused the plaintiffs' decedent to strike his vehicle. See Pls.' Opp'n at 17 (opining how Officer Pearson maneuvered the steering wheel of his vehicle and braced for impact). Although "[the] plaintiff[s] cannot defeat [the defendants'] motion for summary judgment [ ] on elusive concepts such as motive or intent with conclusory allegations, improbable inferences, and unsupported speculation," Robinson, 130 F. Supp. 3d at 192 (internal quotations omitted), their

Fourth Amendment claims against Officer Pearson can survive if "[c]redibility determinations, the weighing of the evidence[ such as the bodycam footage], and the drawing of legitimate inferences from the facts are [proper] jury functions[ and] not those of [the Court.]"  Anderson, 477 U.S. at 255; Scott v. Harris, 550 U.S. 372, 380 (2007) ("[If evidence is] blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of summary judgment.").  But see Wheeler v. Am. Univ., 619 F. Supp. 3d 1, 25 (D.D.C. 2022) (holding that "a jury could draw reasonable inferences in plaintiff's favor based on the video and find that it supports her version of the facts, not defendants' version.").  However, the Court concludes that here, "[although t]he video at least[,] '[conceivably,] can be interpreted in multiple ways,'" id. at 24 (quoting Latits v. Phillips, 878 F.3d 541, 547 (6th Cir. 2007)), "no reasonable jury could believe [the plaintiffs' position], [and, therefore, the C]ourt should not adopt th[eir] version of the facts for purposes of summary judgment[,]" Scott, 550 U.S. at 380.

The plaintiffs argue that the body camera footage depicts Officer Pearson intentionally turning his wheel to block the path of the plaintiffs' decedent.  However, an objective assessment of the footage does not support that position—nor must the Court accept that a reasonable juror might speculatively reach the same conclusion.  See, e.g., Athridge v. Aetna Cas. & Sur. Co., 604 F.3d 625, 631 (D.C. Cir. 2010) ("The possibility that a jury might speculate in the plaintiff[]s['] favor . . . is simply insufficient to defeat summary judgment.").  At best, the footage is ambiguous as to what Officer Pearson is depicted doing other than trying to turn onto Division Avenue and reacting in an indeterminable manner upon seeing the plaintiffs' decedent as he was approaching the officer's vehicle.  See Defs.' Facts ¶ 28 ("Officer Pearson [ ] intended to turn right at the stop sign, from Fitch Place onto Division Avenue."); id. ¶ 32 ("In attempt[ing]

to avoid colliding with the dirt bike in the southbound lane, Officer Pearson accelerated and

steered left, into the northbound lane of traffic.").  Moreover, the defendants' expert notes that

Officer Pearson activated his siren before entering the intersection, which further contradicts the

plaintiffs' position that he intentionally caused the collision.  See Defs.' Mot. Ex. M (Miller

Report) at 2 ("Officer Pearson depressed the horn pad of the steering wheel twice.  This action

activated a loud electronic horn.") (footnote omitted); Johnson v. Wash. Metro Area Transit

Auth., 883 F.2d 125, 128–29 (D.C. Cir. 1989) (holding that summary judgment for a defendant is

appropriate "when a plaintiff's claim is supported solely by [the] plaintiff's own self-serving

testimony, unsupported by corroborating evidence, and undermined [ ] by other credible

evidence[.]"), abrogated on other grounds by Belton v. Wash. Metro Area Transit Auth., 20 F.3d

1197 (D.C. Cir. 1994).  Therefore, the Court rejects the plaintiffs' argument that a reasonable

juror could conclude, based upon the body camera footage alone, that Officer Pearson

intentionally caused the collision.  See, e.g., White v. United States, 863 F. Supp. 2d 41, 48–49

(D.D.C. 2012) (rejecting the plaintiff's position on unclear surveillance footage where it is

directly contradicted by the footage and evidence elsewhere in the record).

The plaintiffs' final argument—that a reasonable juror could conclude that Officer

Pearson intentionally caused the collision based upon the eye-witness statements—equally fails.

The Court first notes that "in judging whether [the] non-movant[s—here, the plaintiffs—]ha[ve]

produced enough to avoid summary judgment, the Court must consider the evidence they

submitted—even if it would be inadmissible at trial in the form submitted—so long as it could be

reduced to an admissible form for trial."  Cook v. Babbitt, 819 F. Supp. 1, 25 (D.D.C. 1993)

(citing Kyriakopoulos v. Geo. Wash. Univ., 866 F.2d 438, 446 (D.C. Cir. 1989)).  Essentially,

each of the witnesses identified by the plaintiffs opine that Officer Pearson intentionally caused

the collision.  See Pls.' Opp'n, Ex. (Squire Statement) at 3–4 (opining on Officer Pearson's "abrupt and poor decision to use [his] vehicle as a means to stop a person"); id., Ex. (Muhammad Statement) at 2 ("It was as if the officer was intentionally barricading or putting an intentional wall in the path of the motorbike rider."); id., Ex. (Smith Statement) at 3 ("It was obvious to me that the driver of the police SUV intentionally entered the lane of the biker in order to prevent his further progress on the bike.").  However, although witnesses may provide lay testimony in regards to what they factually observed, they are not competent to provide their opinions regarding Officer Pearson's intent when he entered the intersection.  See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); see also White, 863 F. Supp. 2d at 48 ("As a rule, statements made by the party opposing summary judgment must be accepted as true, but a party must 'support his allegations . . . with facts in the record,' and 'unsubstantiated allegations . . . will not withstand summary judgment.'") (quoting Greene, 164 F.3d at 675).

Indeed, the Federal Rules of Evidence only permit lay witness opinions that are: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702[, which covers expert testimony]."  Fed. R. Evid. 701; see Fed. R. Evid. 702.  Otherwise, such opinions are inadmissible.  Moreover, a lay witness's opinion is inadmissible if the opinion approaches dangerously close to opining on the ultimate issue in this case—here, whether a Fourth Amendment violation occurred.  See Wright & Miller, 29 Fed. Prac. & Pro. § 6255 (2d ed.) ("[T]he costs of lay opinion increase and the benefits diminish the closer the opinion approaches the crucial issues in the case.").  But see Fed.

R. Evid. 704 ("An opinion is not [necessarily] objectionable just because it embraces an ultimate issue.").  Nonetheless, Federal Rule 56(c)(4)'s requirement is "unequivocal[] and cannot be circumvented.  An affidavit [or declaration supporting or opposing a motion for summary judgment] based merely on information and belief is unacceptable."  <u>Londrigan v. Fed. Bureau of Investigation</u>, 670 F.2d 1164, 1174 (D.C. Cir. 1981).  Thus, because the lay testimony proffered by the plaintiffs seek to introduce opinions from witnesses with no indication that they are competent to explain precisely what Officer Pearson was attempting to do when he entered the intersection, nor would such speculation assist the trier of fact in resolving that factual issue—those opinions would be inadmissible at trial.  Although the witnesses could testify about what they factually observed, they could not offer their opinions on matters that require "scientific, technical, or other specialized knowledge[,]" Fed. R. Evid. 701, such as what Officer Pearson's intent was based on what they observed, assuming that such an opinion would be admissible as expert testimony.  Therefore, the portions of their statements that venture into their opinions about Officer Pearson's intent are "[in]capable of being converted into admissible evidence[,]" <u>Gleklen v. Democratic Cong. Campaign Comm., Inc.</u>, 199 F.3d 1365, 1369 (D.C. Cir. 2000), and the Court cannot rely upon them for purposes of resolving the defendants' motion for summary judgment, <u>see</u> <u>Bortell v. Eli Lilly & Co.</u>, 406 F. Supp. 2d 1, 11 (D.D.C. 2005) ("[I]t is well-settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment[.]") (internal quotation marks omitted).

For all of the above reasons, the Court is unpersuaded that a reasonable juror could find that Officer Pearson intentionally caused the collision with the plaintiffs' decedent.  Accordingly, the Court grants summary judgment as to Counts I and X as to Officer Pearson.

2.  **Whether the Plaintiffs' Fifth Amendment Due Process Rights were Violated by the Defendants (Counts II and XI)**

The defendants argue that "Fifth Amendment claims arising from police chases or pursuits are viable only when there is no Fourth Amendment claim." Defs.' Mot. at 11. More specifically, the defendants contend that because "[t]he Fourth Amendment provides the 'explicit textual source of constitutional protection' against subjecting citizens to unreasonable seizures[,]" the plaintiffs cannot avail themselves of Fifth Amendment protections. Id. (quoting Graham, 490 U.S. at 395). The plaintiffs do not directly challenge this argument in their opposition, but originally alleged in their Complaint that "the [plaintiffs' d]ecedent was unreasonably deprived of his liberty to travel the roads of the United States unimpeded and in the process[,] [the plaintiffs' decedent] was summarily executed by Pearson under color of law with the assistance of [Officers] Jarboe and Gaton." Compl. ¶ 66. The Court agrees with the defendants' position.

As the Court concluded above, see supra Section III.B.1, the facts of this case are properly scrutinized under the Fourth Amendment because this case involves allegations of a seizure and the use of excessive force by Officer Pearson against the plaintiffs' decedent when he collided with Officer Pearson's vehicle. Because the operative conduct in this case involves whether excessive force was employed, "[the plaintiffs'] claims . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive [Fifth Amendment] due process' approach." Graham, 490 U.S. at 395; see Jackson v. District of Columbia, 327 F. Supp. 3d 52, 64 (D.D.C. 2018) (applying Graham in dismissing "duplicative Fifth Amendment claim [because it was] based on the same conduct[ that provided the bases for the Fourth Amendment claim]"). Accordingly, the Court grants summary judgment as to Counts II and XI for all of the defendants in this case.

**3.  The Plaintiffs' <u>Monell</u> Claims Against the District of Columbia (Counts III and XII)**

Next, the Court considers whether the District of Columbia is liable for the actions of its officers under <u>Monell</u>.  The defendants argue that "if the Court grants [their motion for summary judgment] as to Counts I, II, X, and XI based on a finding that the individual [d]efendants did not commit a constitutional violation, that ruling will mandate dismissal of Counts III and XII because the District cannot be liable under § 1983 if there has been no underlying constitutional violation."  Defs.' Mot. at 9.  The plaintiffs allege that "[a]t all levels . . . , the MPD tolerated and ignored the pattern and practice of targeting black bikers with MPD vehicles, whether marked or unmarked and tacitly encouraged it[.]"  Compl. ¶ 73.  Thus, the plaintiffs argue that "[a]s a direct and proximate result of the official and unofficial policies, procedures customs, usages and practices of [the] [ ] D[istrict of ]C[olumbia, it] is directly liable under § 1983 for the violations of [the plaintiffs' d]ecedent's constitutional rights[.]"  <u>Id.</u> ¶ 84.

"Local governing bodies [ ] can be sued directly under § 1983 for . . . relief where [ ] the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers."  <u>Monell</u>, 436 U.S. at 690–91.  However, the governmental "custom" or "policy" need not be formally approved by the relevant government.  <u>Id.</u>  "To state a <u>Monell</u> claim under § 1983, a plaintiff must allege (1) a constitutional violation, and (2) that a custom or policy caused the violation."  <u>Wheeler</u>, 619 F. Supp. 3d at 34.  "<u>Monell</u>'s requirement of a causal link [between the alleged violation and the custom or policy] distinguishes municipal liability under § 1983 from general tort-law principles of <u>respondeat superior</u>, which impose liability 'solely on the basis of the existence of an employer-employee relationship with a tortfeasor.'"  <u>Robinson</u>, 130 F. Supp. 3d at 194 (quoting <u>Monell</u>, 436 U.S. at 692).

Importantly, for a <u>Monell</u> claim to survive summary judgment, "the Court must conclude that there is evidence both (1) of a 'predicate constitutional violation' and (2) 'that a custom or policy of the municipality caused the violation.'"  <u>Louis v. District of Columbia</u>, 59 F. Supp. 3d 135, 150 (D.D.C. 2014) (quoting <u>Baker v. District of Columbia</u>, 326 F.3d 1302, 1305 (D.C. Cir. 2003)).  Here, for the reasons the Court has already indicated <u>supra</u>, Sections III.B.1–2, there are no predicate constitutional violations upon which to base the plaintiffs' <u>Monell</u> claims and, therefore, the Court must conclude that "[the] plaintiff[s] ha[ve] failed to demonstrate the requisite 'predicate constitutional violation[s]' for <u>Monell</u> liability in this case[,]" <u>Louis</u>, 59 F. Supp. 3d at 150.[4]  Accordingly, the Court must grant summary judgment to the District on the plaintiffs' <u>Monell</u> claims (Counts III and XII).

**B.    Whether the Court Should Exercise Supplemental Jurisdiction over the Remaining State Law Claims**

Having granted summary judgment on all of the § 1983 related claims against all of the defendants, the Court next considers whether to exercise supplemental jurisdiction over the remaining state law claims.  Under 28 U.S.C. § 1367(a), the Court may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, courts may decline to exercise supplemental jurisdiction over a state law claim if: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the [ ] court has original jurisdiction, (3) the [ ] court has dismissed all claims over which it has original

---

[4] Because the Court concludes that there is no predicate constitutional violation on which to base a <u>Monell</u> claim, it need not reach the question of whether a custom or policy caused a constitutional violation.

jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." Id. §§ 1367(c)(1)–(4).

Generally speaking, "[the C]ourt may choose to retain jurisdiction over, or dismiss, [the remaining] pendent state law claims after federal claims are dismissed[,]" Shekoyan v. Sibley Int'l, 409 F.3d 414, 423 (D.C. Cir. 2005), a decision that is "left to the sound discretion of the [ ] [C]ourt[,]" Edmonson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1265–66 (D.C. Cir. 1995). "[C]ourts in this jurisdiction routinely decline to exercise supplemental jurisdiction over pendent common law claims after dismissing the § 1983 claims over which they possess original jurisdiction." Buie v. District of Columbia, No. 16-cv-1920 (CKK), 2021 WL 4061142, at *21 (D.D.C. Sept. 7, 2021); see Louis, 59 F. Supp. 3d at 151 (declining supplemental jurisdiction over common law claims after the dismissal of § 1983 claims on summary judgment); Jones v. District of Columbia, No. 21-cv-836 (RC), 2024 WL 1328438, at *16–17 (D.D.C. Mar. 28, 2024) (same). "Instead, courts may dismiss such pendent common law claims without prejudice, allowing plaintiffs to refile their remaining common law claims in state court." Buie, 2021 WL 4061142, at *21. "[I]n the usual case in which all federal law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Here, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. The plaintiffs rely heavily on the position that the officers violated the now-rescinded MPD General Order 301.03 that considered under what circumstances MPD officers were permitted to chase criminal suspects. See generally Pls.' Opp'n. However, the

applicability of such a local issue is best determined by the local court system.  See, e.g., Jackson v. District of Columbia, 83 F. Supp. 3d 158, 172 (D.D.C. 2015) ("[T]he Court finds it most appropriate for the local court system to take the lead in determining the impact of a violation of a local operating procedure on a local cause of action relating to an [incident] of local interest."); see also Wilkins v. District of Columbia, No. 17-cv-884 (CKK), 2020 WL 5816591, at *17 (D.D.C. Sept. 30, 2020) ("For example, the impact of the MPD Use of Force Policy guidelines on the scope of [the p]laintiff's common law assault claims is a uniquely localized matter concerning formative questions of local law enforcement policy.").  Additionally, although much of the evidence focuses on Officer Pearson and the District rather than Officers Jarboe and Gaton, the Court nonetheless finds that it is in the interest of judicial economy and fairness to the plaintiffs to keep the remaining claims against all of the defendants together.  Therefore, the Court will dismiss these remaining claims without prejudice, affording the plaintiffs the opportunity to pursue these claims against the defendants in the Superior Court of the District of Columbia, if they deem it appropriate to do so.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant summary judgment as to the plaintiffs' § 1983 claims and dismisses without prejudice the plaintiffs' state law claims.

**SO ORDERED** this 13th day of March, 2025.[5]

REGGIE B. WALTON
United States District Judge

---

[5] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.